### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. |
| v. | : VIOLATIONS: |
| BALLI AVIATION LTD, | : 50 U.S.C. § 1705 |
| Defendant. | : (International Emergency Economic Powers Act) |
| | : 31 C.F.R. Part 560 |
| | : (Iranian Transaction Regulations) |
| | : 15 C.F.R. Parts 746 and 764 |
| | : (Export Administration Regulations) |

## INFORMATION

The United States Attorney charges that:

## COUNT ONE

At all times material to this Information:

1. Defendant **BALLI AVIATION LTD ("BALLI AVIATION")** was a British corporation with its principal place of business in London, England, and engaged in the business of aircraft sales, leases, and charters.

2. Defendant **BALLI AVIATION** acted, at times, through the following subsidiaries: BLUE SKY ONE LTD, a British corporation; BLUE SKY TWO LTD, a British corporation; and BLUE SKY THREE LTD, a British corporation.

3. Blue Airways was a passenger airline organized under the laws of Armenia.

4. BLUE SKY ONE LTD ("BS1") was a subsidiary of defendant **BALLI AVIATION** and a British corporation that owned Boeing Aircraft 1.

5. BLUE SKY TWO LTD ("BS2") was a subsidiary defendant **BALLI AVIATION** and a British corporation that owned Boeing Aircraft 2.

6. BLUE SKY THREE LTD ("BS3") was a subsidiary of defendant **BALLI AVIATION** and a British corporation that owned Boeing Aircraft 3.[1]

7. There was a privately-held passenger airline organized under the laws of Iran, not named herein, that will hereinafter be referred to as "Iranian Airline A."

8. The United States Department of Commerce, located in the District of Columbia, was responsible for reviewing and controlling the export of certain goods and technologies from the United States to foreign countries. The Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2101-2420, authorized the Department of Commerce to prohibit or curtail the export of any goods and technology, as necessary, to protect, among other things, the national security and foreign policy of the United States. The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774. Although the EAA had lapsed, the EAR continued to be in effect under the provisions of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, by virtue of Executive Order 13222 (August 17, 2001), as extended by successive Presidential notices.

9. Beginning with Executive Order 12170, issued on November 14, 1979, the President has continuously found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

10. On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order 12170 and prohibiting "the exportation from the United States to

---

[1] BS1, BS2, and BS3, collectively, shall be referred to as the "BLUE SKY COMPANIES."

2

Iran . . . or the financing of any such exportation, of any goods, technology . . . or services." The Executive Order also prohibited "the reexportation to Iran . . . of any goods . . . exported from the United States, the exportation of which to Iran is subject to export license application requirements under any United States regulations in effect immediately prior to the issuance of this order," with certain exceptions not applicable in this case. Executive Order No. 12959, as consolidated with other prior Executive Orders in, and supplemented by, Executive Order No. 13059 (August 19, 1997), and as extended by Presidential Notice of March 10, 2004 (69 Fed. R. 12051), was in effect at all times relevant to this Information.

11. The Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations . . . and to employ all power granted to the President by IEEPA and ISDCA [the International Security and Development Cooperation Act of 1985, 22 U.S.C. §§ 2349aa-9] as may be necessary to carry out the purposes" of the Executive Orders.

12. Pursuant to the above-mentioned authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

13. Under the ITR:

    a.    Part 560.204 provided that no goods may be exported, reexported, sold, or supplied, directly or indirectly, from the United States to Iran, without authorization. 31 C.F.R. Part 560.204.

    b.    Part 560.204 further provided that no goods may be exported, reexported, sold, or supplied from the United States to a person in a third country, undertaken without authorization and with knowledge or reason to know

that such goods are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran. 31 C.F.R. Part 560.204.

14. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, had responsibility for administering the ITR, and was the entity empowered to authorize transactions with Iran during the embargo. Such authorization would have been granted in the form of a license.

15. Through the EAR, the Department of Commerce's Bureau of Industry and Security ("BIS") imposed a license or other requirement before an item subject to the EAR could be lawfully exported from the United States or lawfully reexported from another country. The EAR, specifically 15 C.F.R. Part 734.2(b)(6), provided that, for purposes of the EAR, the export or reexport of items subject to the EAR that will transit through a country or countries, or be transshipped in a country or countries to a new country, or are intended for reexport to the new country, are deemed to be exports to the new country.

16. Part 746 of the EAR contained or referenced all of the BIS licensing requirements, licensing policies, and licensing exceptions for countries that are subject to a general embargo or other special controls by the United States, including Iran. Part 746 provided that: "No person may export or reexport items subject to both the EAR and OFAC's ITR without prior OFAC authorization." 15 C.F.R. Part 746.7.

17. The goods at issue in this case are subject to the EAR, 15 C.F.R. Part 734.3(a) and (c), and they are also subject to the ITR, and an OFAC license was required for their export or reexport to Iran.

18. Under Part 764 of the EAR:

   a. Part 764.2(b) provided that no person may cause or aid, abet, counsel, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license or authorization issued thereunder. 15 C.F.R. Part 746.2(b).

   b. Part 764.2(c) provided that no person may solicit or attempt a violation of the EAA, the EAR, or any order, license or authorization issued thereunder. 15 C.F.R. Part 746.2(c).

   c. Part 764.2(d) provided that no person may conspire or act in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or any order, license or authorization issued thereunder. 15 C.F.R. Part 764.2(d).

   d. Part 764.2(e) provided that no person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, any item exported or to be exported from the United States, or that was otherwise subject to the EAR, with knowledge that a violation of the EAA, the EAR, or any order, license or authorization issued thereunder, has occurred, was about occur, or was intended to occur in connection with the item. 15 C.F.R. Part 764.2(e).

**The Conspiracy**

19. Beginning in or at least October 2007, through on or about July 31, 2008, within the District of Columbia and elsewhere, defendant **BALLI AVIATION** willfully conspired to export, directly or indirectly, to Iran three Boeing 747 aircraft, Manufacturer Serial Numbers 24363, 24383 and, 26879 from the United States to Iran in violation of the embargo imposed

upon that country by the United States, without having first obtained the required export license or authorization from the United States Department of Treasury, located in the District of Columbia, or the United States Department of Commerce, located in the District of Columbia.

### Objects of the Conspiracy

20. The objects of the conspiracy were:

    a. to make money for **BALLI AVIATION**;

    b. to supply entities in Iran with the capacity of U.S.-origin aircraft;

    c. to evade the prohibitions and licensing requirements of IEEPA and the Iranian Transaction Regulations; and

    d. to conceal the prohibited transactions from detection by the United States government so as to avoid penalties.

### Manner and Means of the Conspiracy

21. The manner and means by which the defendant and its co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

    a. Defendant **BALLI AVIATION,** through its subsidiaries the BLUE SKY COMPANIES, would and did purchase U.S.-origin aircraft with financing obtained from Iranian Airline A.

    b. Defendant **BALLI AVIATON** would and did cause U.S.-origin aircraft to be exported from the United States to Iran without obtaining a license or other authorization from the United States Department of Treasury, Office of Foreign Asset Control, or the United States Department of Commerce, Bureau of Industry and Security.

  c. Defendant **BALLI AVIATION** would and did enter into lease arrangements that permitted Iranian Airline A to utilize and continue to utilize U.S.-origin aircraft for flights in and out of Iran.

### Overt Acts

22. In furtherance of this conspiracy, defendant **BALLI AVIATON**, and other co-conspirators committed overt acts, including but not limited to the following:

  a. In or before October 2007, Iranian Airline A contacted defendant **BALLI AVIATION** to obtain assistance with the exportation of U.S.-origin Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 to Iran.

  b. In or before October 2007, Iranian Airline A loaned defendant **BALLI AVIATION**, through its subsidiaries the BLUE SKY COMPANIES, the money to purchase Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 through a United Arab Emirates company, Blue Sky Aviation FZE.

  c. In or before October 2007, defendant **BALLI AVIATION**, through its subsidiaries the BLUE SKY COMPANIES, purchased Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

  d. In or before October 2007, defendant **BALLI AVIATION** and the BLUE SKY COMPANIES entered into separate lease agreements with Blue Airways for one-year leases of Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

  e. In or before October 2007, Iranian Airline A began utilizing the capacity of Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 on regular flights in and out of Tehran, Iran.

  f. In or about November 2007, defendant **BALLI AVIATION** extended the lease arrangements with Blue Airways that allowed Iranian Airline A to continue to utilize Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 for another year, despite the fact that defendant **BALLI AVIATION** had received an advisory letter from Boeing Company informing that Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 were being utilized by Iranian Airline A for flights in and out of Iran, and despite correspondence from the Department of Commerce, sent in the fall of 2007, alerting defendant **BALLI AVIATION** not to engage in the export or re-export of the aircraft to Iran.

(**Conspiracy to Unlawfully Export**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560).

## COUNT TWO

23. The allegations in Paragraphs 1 through 22 are hereby realleged as if fully set forth herein and are incorporated by reference.

24. On or about March 17, 2008, pursuant to Part 766.24 of the EAR, the United States Department of Commerce issued to defendant **BALLI AVIATION** a Temporary Denial Order ("TDO"). A copy of the TDO was delivered to defendant **BALLI AVIATION** and was also published in the Federal Register. The TDO prohibited, among other things:

> Carrying on negotiations concerning or ordering, buying, receiving, using, selling, delivering, storing, disposing of, forwarding, transporting, financing, or otherwise serving in any way, any transaction involving any item exported or to be exported from the United States that is subject to the EAR, or in any other activity subject to the EAR.

25. Part 736.2(b)(4)(i) of the EAR prohibited the willful violation of a denial order, temporary or permanent, issued by the United States Department of Commerce:

> You may not take any action that is prohibited by a denial order issued under part 766 of the EAR, Administrative Enforcement Proceedings. These orders prohibit many actions in addition to direct exports by the person denied export privileges, including some transfers within a single country, either in the United States or abroad, by other persons. You are responsible for ensuring that any of your transactions in which a person who is denied export privileges is involved do not violate the terms of the order. Orders denying export privileges are published in the Federal Register when they are issued and are the legally controlling documents in accordance with their terms. [BIS] also maintains compilations of persons denied export privileges on its Web site at *http://www.bis.doc.gov*. [BIS] may, on an exceptional basis, authorize activity otherwise prohibited by a denial order. 15 C.F.R. Part 764.3(a)(2).

9

26. Starting in or about March 2008 and continuing through in or about August 2008, within the District of Columbia and elsewhere, the defendant **BALLI AVIATION** willfully violated a denial order issued by the Department of Commerce, located in the District of Columbia, by carrying on negotiations with others concerning buying, receiving, using, selling, and delivering Boeing 747s, which were U.S.-origin aircraft subject to the EAR.

(**Willful Violation of Denial Order**, in violation of Title 50, United States Code, Section 1705 and Title 15, Code of Federal Regulations, Section 764.2(a), (b), (k)).

_____
CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

_____
Anthony Asuncion
Assistant United States Attorney
D.C. Bar No. 420822
National Security Section
555 Fourth Street, NW (11th Floor)
Washington, D.C. 20530
(202) 514-6950
Anthony.Asuncion@usdoj.gov

_____
Jonathan C. Poling
Trial Attorney
D.C. Bar No. 489459
Counterespionage Section
Department of Justice
1400 New York Avenue, N, W. (9th Floor)
Washington, D.C. 20005
(202) 305-0179
Jonathan.Poling@usdoj.gov