UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 09-366 (ESH) |
| v. | : | |
| BALLI AVIATION LTD, | : | |
| Defendant. | : | |

FILED

FEB 0 5 2010

Clerk, U.S. District and
Bankruptcy Courts

## FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

Had this case gone to trial, the United States would have proven beyond a reasonable doubt that:

From on or at least October 2007 through on or about July 31, 2008, within the District of Columbia and elsewhere, **BALLI AVIATION LTD ("BALLI AVIATION")** willfully conspired to export, re-export or attempt to export or re-export, directly or indirectly, from the United States to Iran three Boeing 747 aircraft, Manufacturer Serial Numbers ("MSNs") 24363, 24383, and 26879 (respectively, "Boeing Aircraft 1," "Boeing Aircraft 2," and "Boeing Aircraft 3"), without obtaining an export license from the United States Department of the Treasury, located in the District of Columbia, or the United States Department of Commerce, located in the District of Columbia.

Starting in or about May 2008 and continuing through in or about July 2008, within the District of Columbia and elsewhere, defendant **BALLI AVIATION**, in violation of a Temporary Denial Order issued by the United States Department of Commerce, Bureau of Industry and Security ("BIS"), willfully carried on negotiations with persons concerning financing, receiving and using three Boeing 747s, specifically

Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3, each of which was subject to the Export Administration Regulations.

1. Defendant **BALLI AVIATION** was a British corporation with its principal place of business in London, England, and engaged in the business of aircraft sales, leases, and charters.

2. BLUE SKY ONE LTD ("BS1") was a subsidiary of defendant **BALLI AVIATION** and a British corporation that owned Boeing Aircraft 1.

3. BLUE SKY TWO LTD ("BS2") was a subsidiary defendant **BALLI AVIATION** and a British corporation that owned Boeing Aircraft 2.

4. BLUE SKY THREE LTD ("BS3") was a subsidiary of defendant **BALLI AVIATION** and a British corporation that owned Boeing Aircraft 3.[1]

5. Blue Airways was a passenger airline organized under the laws of Armenia.

6. There was a privately-held passenger airline organized under the laws of Iran, not named herein, that will hereinafter be referred to as "Iranian Airline A."

7. Blue Sky Aviation FZE was a privately-held company organized under the laws of Ajman in the United Arab Emirates.

8. Eagle Aviation was a company organized under the laws of France engaged in purchasing, operating and leasing aircraft.

### Relevant Legal Authorities

9. The parties agree for the purpose of this plea and factual proffer that the relevant law is set forth accurately in the Information. To summarize, the Iranian Transaction Regulations ("ITR"), 31 C.F.R. Part 560, issued pursuant to the

---

[1] BS1, BS2, and BS3, collectively, shall be referred to as the "BLUE SKY COMPANIES."

2

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, implemented Presidential Executive Orders imposing an embargo against Iran. The ITR prohibit any exportation, reexportation, sale or supply directly or indirectly from the United States or by a United States person, of any goods, technology or services to Iran without prior authorization from the United States Government. 31 C.F.R. Part 560.204. They further prohibit the exportation, reexportation, sale or supply to a third country undertaken with knowledge or reason to know that the export is intended for Iran or for use in the production of, commingling with or for incorporation into goods, technology or services for Iran without prior authorization from the United States Government. Id. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, has responsibility for administering the ITR, and is the entity empowered to authorize transactions with Iran during the embargo. Such authorization, if granted, would be in the form of a license.

10. The Export Administration Regulations ("EAR"), 15 C.F.R. Part 746, promulgated pursuant to the Export Administration Act, 50 U.S.C. § 2401, et seq., and kept in force under the IEEPA, prohibit exports subject to the ITR without prior authorization from the U.S. Government. 15 C.F.R. Part 746.7.

**Unlawful Export of Boeing Aircraft to Iran**

11. On or about December 9, 2002, United Airlines ("UAL") entered Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court of the Northern District of Illinois. As part of this bankruptcy, UAL sold assets, including Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3, to U.S. Bank National Association ("U.S. Bank"). U.S. Bank then placed Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 on the market for sale.

12. Beginning in or about the summer of 2005, Iranian Airline A, an airline based in Tehran, Iran, that ran domestic flights within Iran and international flights out of airports in Tehran, Iran, and elsewhere, became interested in obtaining aircraft capacity from the UAL bankruptcy.

13. In or about late 2005 or early 2006, one or more representatives of Iranian Airline A met with and informed one or more representatives of defendant **BALLI AVIATION** of Iranian Airline A's need to acquire additional civilian carrying capacity, and its current efforts to make acquisitions of Boeing Aircraft from the United States. Specifically, during these meetings, defendant **BALLI AVIATION** learned of Iranian Airline A's concerns about its attempts to purchase, through Eagle Aviation S.A., a now dissolved French company, Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 that had been operated by UAL, but had been grounded in the United States after UAL filed for Chapter 11 bankruptcy.

14. In or about late 2005 or early 2006, defendant **BALLI AVIATION** reviewed a D.C. law firm's legal opinion provided to it by Iranian Airline A dated August 31, 2005 ("Law Firm Opinion"), that was rendered in connection with a wholly unrelated commercial aviation transaction involving the sale of aircraft from one European company to another.

15. The Law Firm Opinion quoted and explained prohibitions of the ITR including, but not limited to, the prohibition on the exportation of U.S.-origin goods to Iran without a license from OFAC "with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran." The Law Firm Opinion also quoted and explained prohibitions of the EAR, including, but

not limited to, the prohibition of exports to Iran from the United States of any U.S.-origin product or technology without a license from BIS or OFAC.

16. Despite the prohibitions of the ITR as outlined in the Law Firm Opinion, defendant **BALLI AVIATION** decided it would be profitable to enter into a transaction that would result in Iranian Airline A obtaining access to civilian carrying capacity deriving from Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3, which defendant **BALLI AVIATION** understood to be located within the United States.

17. On or about January 17, 2006, Iranian Airline A again met with defendant **BALLI AVIATION** in the United Kingdom to continue to discuss Iranian Airline A's need for Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 capacity. As part of this discussion, Iranian Airline A informed defendant **BALLI AVIATION** that it had received a loan in the amount of 140 million U.S. dollars from the Iranian Foreign Exchange Reserve Fund ("FERF"), also known as Foreign Currency Reserve Account ("FCRA"), which is a sovereign wealth fund set up by an Act of the Parliament of Iran. The FERF/FCRA directed that Bank Melli of Dubai be appointed as the implementing bank to fund the transactions for Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

18. Iranian Airline A explained to defendant **BALLI AVIATION** that it was attempting to procure Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 from the United States owners through Eagle Aviation, but that the transaction was in jeopardy. Specifically, Iranian Airline A explained to defendant **BALLI AVIATION** that although Eagle Aviation had been able to make an initial successful bid and paid a deposit of 10.5 million U.S. dollars to U.S. Bank for Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3, it was unable to complete the purchase of the

5

aircraft. This was because Eagle Aviation did not have sufficient credit and commercial standing to fulfill the conditions of the FERF/FCRA approval, which expressly required that the owner of the aircraft be a significant and creditworthy company.

19. Knowing that Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3, once acquired from the United States, were to be used by Iranian Airline A to fly routes into and out of Iran and with knowledge of United States regulations and laws relating to the U.S. embargo against Iran, defendant **BALLI AVIATION**, through its subsidiaries the BLUE SKY COMPANIES, pursuant to contracts signed with Iranian Airline A and other parties, agreed to purchase Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

20. As anticipated, Eagle Aviation's deteriorating financial condition prevented it from becoming the purchaser of the Boeing Aircraft. Thus, as agreed to between the parties, Iranian Airline A loaned defendant **BALLI AVIATION**, through its subsidiaries the BLUE SKY COMPANIES, the money to purchase Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 through a United Arab Emirates company, Blue Sky Aviation FZE.

21. On or about March 10, 2006, U.S. Bank transferred legal title for Boeing Aircraft 1, Boeing Aircraft 2 and Boeing Aircraft 3 to Wells Fargo Bank Northwest National Association ("Wells Fargo"), a United States bank headquartered in Ogden, Utah.

22. On or about September 28, 2006, Wells Fargo executed bills of sale to transfer rights, title and interest in Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 to defendant **BALLI AVIATION**, through its subsidiaries, the BLUE SKY COMPANIES. At no point prior to or after the sale of Boeing Aircraft 1, Boeing

Aircraft 2, and Boeing Aircraft 3 did defendant **BALLI AVIATION** inform the United States sellers of the aircraft that held rights, title and interest in Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 that the aircraft were being acquired to provide capacity for Iranian Airline A to fly routes in and out of Iran.

23. Defendant **BALLI AVIATION**, through its subsidiaries, the BLUE SKY COMPANIES, thus became the purchaser of the aircraft. Defendant **BALLI AVIATION** acted with the understanding that its actions were necessary, as otherwise Iranian Airline A could not have acquired access to capacity provided by Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

24. In or about October 2006, defendant **BALLI AVIATION** and the BLUE SKY COMPANIES entered into separate lease agreements with Blue Airways for one year leases of Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

25. As early as in or about December 2006, Iranian Airline A, with the knowledge of defendant **BALLI AVIATION**, began utilizing the capacity of Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 on regular flights in and out of Tehran, Iran.

26. In or about July 2007, the Boeing Company, the U.S. manufacturer of Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3, sent a letter which advised **BALLI AVIATION**, through its subsidiaries, the BLUE SKY COMPANIES, that pursuant to the EAR, "a license must be obtained from the U.S. Government before re-exporting Boeing airplanes to Iran, which is subject to a comprehensive embargo" and demanded that the BLUE SKY COMPANIES "remove [Boeing Aircraft] from providing services and/or benefits to any Iranian entity, such as [Iranian Airline A]."

27.     On or about October 10, 2007, the Department of Commerce sent a letter to defendant **BALLI AVIATION** warning that the export or re-export of the Boeing Aircraft to Iran would constitute a violation of the EAR.

28.     Despite knowing of the prohibitions of the ITR through the Law Firm Opinion, and receiving the aforementioned letters from the Boeing Company and the Department of Commerce, defendant **BALLI AVIATION** agreed in or about November 2007 to extend the lease arrangements with Blue Airways that allowed Iranian Airline A to continue to utilize Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 for another year.

29.     At no time did defendant **BALLI AVIATION** apply for, receive, or possess a license or authorization from OFAC or BIS to export goods, technology, or services, of any description, to Iran.

### Willful Violation of the Temporary Denial Order

30.     On or about March 17, 2008, pursuant to Section 766.24 of the EAR, the United States Department of Commerce placed defendant **BALLI AVIATION** and others on a Temporary Denial Order ("TDO").  A copy of the TDO was delivered to defendant **BALLI AVIATION** and was also published in the Federal Register. The TDO prohibited defendant **BALLI AVIATION** from, among other things:

> Carrying on negotiations concerning or ordering, buying, receiving, using, selling, delivering, storing, disposing of, forwarding, transporting, financing, or otherwise serving in any way, any transaction involving any item exported or to be exported from the United States that is subject to the EAR, or in any other activity subject to the EAR.

31. This TDO was in effect for a period of 180 days.

32. Notwithstanding these prohibitions, defendant **BALLI AVIATION**, entered a new round of negotiations in or around July 2008. Specifically, on or about July 31, 2008, defendant **BALLI AVIATION** and Iranian Airline A executed an agreement under which defendant **BALLI AVIATION** would use funds Iranian Airline A had previously provided to it to purchase a third company, to be used to acquire control of Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

33. In addition, in or about August 2008, personnel from defendant **BALLI AVIATION** and Iranian Airline A traveled to Iceland and met with this third company to discuss a possible partnership involving the ownership and operation of the aforementioned Boeing Aircraft.

### Limited Nature of Factual Proffer in Support of Guilty Plea

34. This factual proffer is not intended to constitute a complete statement of all facts known by the United States, but is intended to provide the necessary factual predicate for defendant **BALLI AVIATION'S** plea of guilty to Counts 1 and 2 of the Information.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By: _____
Anthony Asuncion
Assistant United States Attorney
D.C. Bar No. 420822
National Security Section (11th Floor)
555 Fourth Street, N.W.
Washington, D.C. 20530
Anthony.Asuncion@usdoj.gov

9

_____
Jonathan C. Poling
Trial Attorney
D.C. Bar No. 489459
Counterespionage Section
Department of Justice
1400 New York Ave. N.W. (9th Floor)
Washington, D.C. 20005
Jonathan.Poling@usdoj.gov

<u>Defendant's Stipulation and Signature</u>

I am authorized to act on behalf of defendant Balli Aviation Ltd in this matter.

On behalf of defendant Balli Aviation Ltd, after consulting with its attorneys and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above proffer of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 12/14/09

Balli Aviation Ltd

_____

<u>Attorney's Acknowledgment</u>

I am counsel for defendant Balli Aviation Ltd. I have carefully reviewed the above proffer of facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

Date: 12/16/09

_____
PAUL W. BUTLER, ESQ.
Attorney for Defendant Balli Aviation Ltd